UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CR 789 |
| v. | ) | |
| | ) | |
| RONALD FEDER | ) | Judge Matthew F. Kennelly |

**Government's Sentencing Memorandum**

On January 25, 2018, the defendant, Ronald Feder, was indicted on five counts: transportation of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(1) (Counts 1-3), distribution of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(2)(B) (Count 4), and possession of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(5)(B) (Count 5).

On February 19, 2019, defendant entered into a plea agreement by which he pled guilty to counts 1 and 4 of the indictment and stipulated to an additional possession of child pornography charge pending in the pre-existing case *US v. Feder*, 16 CR 587 (Shah, J.). As part of his plea agreement, defendant and the government agreed pursuant to Fed R. Crim. P. 11(c)(1)(C) that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 300 months.

For the reasons set forth below, the United States requests that the Court sentence defendant to a sentence of 300 months, as well as lifetime supervised

release, subject to the conditions described below and in the Presentence Investigation Report ("PSR").

## I. Nature and Circumstances of the Offense

In summary, and as set forth in in the PSR, the Government's Version of the Offense, the Plea Agreement (R. 45), and the Complaint (R. 1.), in November 2017, while on pretrial release in relation to another child pornography case pending before the Honorable Judge Shah, defendant offered to trade child pornography with an undercover law enforcement officer (the "UC") in exchange for access to molest the UC's minor nephew and niece (who, unbeknownst to defendant, did not exist). Over the course of the next several weeks, defendant did, in fact, send photos and videos containing child pornography to the UC and, on December 7, 2017, met with the UC in person in Lincolnwood, Illinois, and there, in exchange for a pair of children's underwear, provided the UC with a flash drive containing approximately 453 videos and 7,932 images containing child pornography. During that meeting, defendant also provided the UC with directions on how to locate a guide on the Dark Web with instructions on molesting children and further discussed with the UC plans to arrange a meeting at which defendant could molest the UC's minor relatives. Defendant was arrested immediately following that meeting and a subsequent search of his home uncovered additional child pornography, among other things.

More specifically, between January 12, 2014, and June 28, 2014, defendant, while an employee of the Department of Defense stationed in Japan and the Philippines, possessed multiple electronic devices containing child pornography, including child pornography depicting prepubescent minors being bound and raped.

On September 14, 2016, defendant was charged in the U.S. District Court for the Northern District of Illinois with possession of child pornography by a person employed by U.S. armed forces outside the United States (*US v. Feder*, 16CR587 (Shah, J.)). Defendant was subsequently granted pre-trial release which included, among other release conditions, a prohibition on defendant's use of the internet. Defendant was set to plead guilty to the charges in that case on December 11, 2017 (*see* 16CR587, R. 32). During the investigation of this offense, defendant also admitted that at age 17 he had molested his 9-year-old brother.[1]

On November 26, 2017, while on pretrial release, and just weeks before his scheduled change of plea date, defendant responded to an advertisement posted by the UC on Craiglist.com seeking individuals interested in discussing a "taboo request." In particular, defendant sent the UC a message stating that he had a "collection" available to share and would discuss it with the UC via the encrypted mobile chat application Wire Swiss GmbH ("Wire"). Defendant communicated extensively with the UC on Wire over the next several weeks.[2]

In their initial Wire communication, on November 26, 2017, defendant sent the UC multiple images containing child pornography—including images depicting adults and prepubescent children sexually abusing other prepubescent children—and informed the UC that defendant's preference in child pornography was boys and girls

---

[1] As noted in the PSR, defendant was arrested in February 2005 for allegedly placing his penis into the mouth and anus of his then nine-year-old brother (PSR ¶ 61.)

[2] The text of these communications, as well as descriptions of the child pornography shared by defendant, is contained at pages 6-15 of the Complaint (R.1).

3

between the ages of 3 and 14. In that initial communication, defendant also offered to trade the UC between 60-80 gigabytes of videos and pictures of child pornography in exchange for the UC arranging a meeting at which defendant could molest the UC's eight-year-old niece and ten-year-old nephew for one to two hours. Defendant further told the UC that he had pictures from other individuals that he could not share with defendant because they depicted those individuals' nieces and nephews. Finally, defendant ended this initial communication by informing the UC that he was about to meet with an individual to trade child pornography in exchange for the used underwear of that individual's nine-year-old cousin. As previously noted, defendant was on pretrial release at this time.

On November 27, 2017, defendant again sent the UC images containing child pornography—including images depicting nude prepubescent children—and described to the UC sexual fantasies he entertained about the children he encountered at the grocery store where he worked.[3] Defendant also reaffirmed his desire that the UC arrange a meeting at which defendant could molest the UC's minor niece and nephew, and proposed, as a cover, that the UC tell the parents of the UC's niece and nephew that the UC was taking them on a field trip to Chicago. Defendant also discussed strategies for convincing the UC's minor niece and nephew to participate in the molestation, and suggested to the UC that the UC show them child pornography.

---

[3] As noted in the PSR, defendant in fact was working at the time at a grocery store in Skokie, Illinois. (PSR, at ¶ 104.)

4

On November 28, 2017, defendant again sent the UC images containing child pornography, including multiple images depicting prepubescent children being sexually abused by adults. Additionally, defendant suggested that the UC tell his minor niece and nephew that defendant was a sex-ed teacher, asked that the UC show his minor nephew the child pornography that defendant was sending to the UC, and requested that the UC send defendant pictures of the minor niece and nephew.

On November 29, 2017, defendant again sent the UC images and videos containing child pornography, including a video depicting a prepubescent girl being raped by an adult male. During their communication that day, defendant fantasized about molesting the UC's minor niece and nephew, discussed an encounter he had had with a five-year old boy at work, and made plans with the UC to meet to trade and masturbate to child pornography. On December 1, 2017, defendant sent the UC an additional image depicting a prepubescent female being sexually abused by an adult male.

On December 2, 2017, defendant had a phone call with the UC in which defendant instructed the UC on how to find child pornography online. Defendant suggested that the UC show the UC's minor niece child pornography as a method of conditioning her to be more receptive to defendant's molestation. Defendant also requested a picture of the UC's niece and asked the UC to steal a pair of her underwear.

Between December 4 and December 6, 2017, defendant and the UC made plans to meet at a coffee shop in Lincolnwood, Illinois on December 7, 2017 (approximately

5

four days before defendant was set to plead guilty in the pending case in this District before Judge Shah) so that defendant could provide the UC with child pornography in exchange for a pair of the UC's minor niece's underwear.

As they had planned, on December 7, 2017, defendant and the UC met at a coffee shop in Lincolnwood, Illinois. During the meeting, defendant handed the UC a 16 gigabyte thumb drive (later found to contain approximately 453 videos and 7,932 images containing child pornography, including multiple videos showing adult males ejaculating onto the faces of prepubescent minors), and, in exchange, the UC provided defendant with a bag containing a pair of children's underwear. During the meeting, defendant provided the UC with advice on locating child pornography on the Dark Web, avoiding law enforcement detection, and for locating a particular website that contained tips for molesting children. Defendant additionally directed the UC on how to locate online a 475-page document entitled "The Pedophile's Handbook," which included sections with guidance on such topics as "Finding Children: Babysitting and Scouting," "Kiddie Magnets," "Sex with Kids: Penetration Training," and "Escape Planning." During the meeting, defendant also again discussed with the UC the coordination of a meeting at which defendant could molest the UC's minor nephew and niece.

Defendant was arrested immediately following this meeting. During a subsequent search of defendant's home—where he was staying while on pretrial release—law enforcement recovered, among other things, latex molds of

6

prepubescent vaginas, female children's underwear, and numerous electronic devices, including multiple devices containing additional child pornography.

## II. Probation Correctly Calculated Defendant's Guideline Range

The government agrees with probation's calculation of defendant's guideline range, which is contained at paragraphs 9-10 of the PSR, and concludes that defendant's offense level is 42, his criminal history category is I, and his guideline range is 360 months to life, adjusted based on the statutory maximum to 360 months' to 480 months. (PSR ¶ 121.) The government agrees that the guideline range for supervised release is between 5 years and life for both counts to which defendant has pled guilty (PSR ¶¶ 123-125.)

## III. Defendant Should Receive a Sentence of 300 Months' Imprisonment and Lifetime Supervised Release

As noted at pages 14-16 of the Plea Agreement, based on defendant's cooperation with the government,[4] the government intends to move at sentencing, pursuant to Guideline § 5K1.1, that the Court depart downward from the applicable guideline range. In particular, as detailed at paragraph 13 of the Plea Agreement, defendant and the government have agreed pursuant to Fed. R. Crim. P. 11(c)(1)(C) that the sentence imposed by the Court shall include a term of imprisonment of 300 months.

The government additionally requests that the Court sentence defendant to lifetime supervised release upon the completion of his sentence. Defendant is a

---

[4] Defendant's cooperation is detailed at pages 6-10 of the Government's Version of the Offense. At sentencing, the government intends to orally provide the Court with additional details relating to defendant's cooperation.

serious danger to the public. He is now, and will be upon his release. At the time defendant was arrested in this case, he was aggressively attempting to obtain access to children to molest and, indeed, was using his vast collection of child pornography as a bartering tool to that end. Defendant did this *while on pretrial release for, and days before pleading guilty to, another child pornography offense in this District.* Defendant's impending sentence did not dissuade him from distributing child pornography and seeking out children, if anything, it appears to have encouraged him to find a child before his sentence began.

There can be little doubt that, were he communicating with an actual pedophile rather than a UC, defendant would have followed through and sexually abused the UC's minor relatives. It would not have been the first time: as noted above, defendant previously sexually abused his own nine-year-old brother. Indeed, that defendant did not, to law enforcement's knowledge, successfully molest any children in the weeks before his arrest is a miracle since, as he told the UC in their Wire communications, defendant was actively fantasizing about children he encountered at work and was meeting in person with other pedophiles to trade pornography and acquire used children's underwear for his collection. Were he not so focused on gaining access to the UC's fictional minor relatives, it is likely defendant would have found a different, and far more tragic, outlet for his desires.

Perhaps most disturbingly, it is clear from defendant's communications with the UC that defendant was not only thinking about molesting children, he had researched the subject extensively. Defendant was, if anything, excited to coach the

8

UC on how best to condition children to be molested, even directing the UC to online guides on how to meet, condition, and molest children (and avoid law enforcement detection thereafter). This was not mere fantasy for defendant; rather, defendant was attempting to make concrete plans with the UC to molest the UC's niece and nephew, and encouraging the UC to begin conditioning them so that defendant could more easily sexually abuse them in person.

That pretrial services was unaware defendant was engaging in this behavior—not only continuing to watch and share child pornography but also meeting in person with other pedophiles—only underscores the degree of danger that defendant poses to the community. Defendant is not just a predator, he is a predator who has shown a commitment to educating himself (and instructing others) on how best to victimize children and obtain child pornography. Defendant has demonstrated an ability and willingness to do so even while under court-supervision.

Other than defendant's substantial cooperation, which is detailed in the Government's Version of the Offense, there is very little in mitigation here, and defendant's cooperation does not lessen the public danger defendant will pose upon his release. Defendant describes growing up in difficult circumstances, with a physically abusive father; however, defendant also admits to sexually abusing his own brother. Thus, though defendant suffered a difficult childhood, he had little reticence in making his younger brother's childhood not just difficult, but traumatic.

Further, the government submits that the Court should view with deep skepticism defendant's claim that he is remorseful for and appreciates the harm his

conduct has caused to the victims of child pornography (PSR ¶ 36). Back in December 2017, defendant was no doubt preparing to inform a different court that he was remorseful and appreciated the harm his conduct had caused, as he was readying to plead guilty to one child pornography offense at the same time he was committing the child pornography offenses underlying the instant case. Defendant's interview with pretrial services is also revealing about his character and lack of remorse. In it, defendant claimed that, after molesting his brother, he would never sexually abuse another individual under 18 (PSR ¶ 83), despite admitting in the Plea Agreement to attempting to do just that to the UC's eight-year-old niece and ten-year-old nephew. Defendant also claimed in his interview that he had not viewed pornography of any kind since early 2017, despite admitting to distributing child pornography to the UC in December 2017.

The government encourages the Court to review the communications between the UC and defendant contained in the Complaint (R. 1). They show defendant for who he is: not an individual ashamed by his addiction to child pornography but, rather, a child exploitation enthusiast, excited to share and discuss his passion for child pornography and molestation with other like-minded individuals. He is an individual who, both for the protection of the community and for his own rehabilitation, needs to be supervised for the rest of his life.

## IV.  Restitution

The government asks that restitution in the amount of $69,000 be ordered. The government and defense counsel have agreed on a restitution amount of $3,000 per child pornography victim. The government has received restitution requests from

23 victims, resulting in the $69,000 figure.[5] The government agrees with probation that, although defendant is facing a 25-year sentence, and has a negative net worth, defendant may be able to earn and contribute some amount towards restitution while incarcerated (PSR ¶ 119.) Further, defendant will be in his 50's when he completes his sentence, has a college degree, and should be able to obtain employment upon his release.

## V. Fine

The government agrees with probation that, given defendant's negative net worth, no fine should be imposed.

## VI. Probation Conditions

### A. Mandatory Conditions

With respect to the mandatory conditions, the PSR recommends the following mandatory conditions, specifically, that defendant: (1) "not commit another Federal, State, or local crime"; (2) "not unlawfully possess a controlled substance"; (3) "register and comply with all requirements of the Sex Offender Registration and Notification Act"; (4) "cooperate in the collection of a DNA sample if the collection of such a sample is required by law"; and (5) "refrain from unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release."

---

[5] At the time the PSR was drafted, the government had received only 22 victim restitution requests, resulting in probation's recommendation of $66,000 restitution (PSR ¶ 134). Subsequent to the issuance of the PSR, the government received one additional victim restitution request, which was submitted to the Court as an attachment to probation's Second Supplemental Report (R. 50).

11

B. <u>Discretionary Conditions</u>

The government agrees with the discretionary conditions recommended in the PSR with the exception of condition 7, for which it suggests a modification. In particular, discretionary conditions 4 and 6 support defendant's rehabilitation by requiring defendant to seek employment and to refrain from communicating or meeting with persons he knows to be engaged in criminal activity (which will include online communications or in-person meetings with other child-pornography collectors).

Discretionary condition 7 prohibits defendant from use of alcohol. From speaking with probation, the government understands that this condition was recommended by probation because of concern that the use of alcohol might lower defendant's self-control, and make it more likely that he recidivate. The government understands and agrees with probation's position generally but, given the absence of a history of substance abuse by defendant, believes the concern could be addressed by a requirement that defendant not use alcohol to excess, rather than a blanket prohibition.

Discretionary condition number 8 prohibits defendant from possessing a firearm, destructive device, or other dangerous weapon. This condition is appropriate since, upon release, defendant will be a felon prohibited from possessing a firearm, and is particularly appropriate here given that defendant has possessed multiple firearms in the past (PSR ¶ 72), and poses an active danger to children.

Discretionary condition 9 requires defendant to participate in a treatment program at the direction of a probation officer. Given the nature of the offense, and the danger defendant poses to the community, particularly if left untreated, this condition is plainly appropriate.

Discretionary conditions 14-18 in the PSR facilitate the supervision of defendant. For example, discretionary condition 14 directs defendant to remain in the Northern District of Illinois and discretionary condition 15 directs him to report to a probation officer. These conditions will help keep defendant in contact with his probation officer. Discretionary condition 16 allows a probation officer to visit defendant at any reasonable time at home, work, school, or other reasonable location, and allows for the confiscation of contraband observed in plain view. Discretionary conditions 17 and 18 merely require defendant to stay in touch with his officer in the face of substantial changes or interaction with law enforcement, all of which impose minimum duties on defendant and assist the probation officer in doing his/her job.

Discretionary condition 23 allows a probation officer to search defendant's person, property, house, residence, vehicle, or electronic devices if reasonable suspicion exists that defendant violated a condition of his supervision. Given defendant's history of engaging in criminal activity while under supervision, this condition is both appropriate and necessary.

C. Special Conditions

In addition to the mandatory and discretionary conditions detailed above, the PSR recommends 10 special conditions, all of which the government agrees. Special

conditions 5-8 and 10 encourage defendant's financial responsibility and ability to repay restitution by, for example, preventing defendant from obtaining new credit charges without approval, allowing probation to monitor defendant's finances, requiring defendant to pay his taxes and to notify the court of martial financial changes, and putting defendant on a 10% payment plan until his restitution is repaid.

Special condition 9 and 13-15 all work to prevent defendant from re-engaging in the offenses of conviction. For example, special condition 9 requires defendant to participate in a sex offender treatment program which includes, among other things, monitoring and restriction on internet use, restriction on activities and employment that may put defendant in contact with children, and a prohibition on defendant's possession of child pornography. Special condition 13 allows probation to require, at its discretion, that defendant inform others that he poses a risk. Special condition 14 prohibits defendant's use of an external storage device without prior approval. Special condition 15 prohibits defendant from masturbating in vehicles or in public. Given the nature of this offense, these conditions are clearly appropriate and will help prevent defendant from endangering others or being tempted to recidivate.

Finally, special condition 11 provides that defendant shall "not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court." This condition enjoys ample support from Seventh Circuit precedent. *See United States v. Kappes*, 782 F.3d 828, 851 (7th Cir. 2015) (finding that the district court's lack of findings to support this condition was harmless because "acting as a confidential informant is generally inconsistent with

14

the rehabilitative and re-integrative goals of supervision") (internal quotation and end citation omitted).

## IV. Conclusion

For the reasons set forth above, the government respectfully requests that the Court sentence defendant Ronald Feder to a term of imprisonment of 300 months followed by lifetime supervised release. This sentence reflects the serious nature of the offense and the history and characteristics of the defendant, but is not greater than necessary to reflect the goals of sentencing espoused in 18 U.S.C. § 3553.

                              Respectfully submitted,

                              JOHN R. LAUSCH, JR.
                              United States Attorney

By:   */s/Andrew J. Dixon*
       Andrew J. Dixon
       Assistant United States Attorney
       219 South Dearborn Street
       Chicago, Illinois 60604
       (312) 697-4063

Dated: June 13, 2019