1

1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION

3

4

UNITED STATES OF AMERICA,            )    Docket No. 17 CR 789
5                                     )
                    Plaintiff,        )
6                                     )
             vs.                      )
7                                     )
RONALD FEDER,                         )    Chicago, Illinois
8                                     )    August 13, 2019
                    Defendant.        )    1:30 o'clock p.m.
9
                TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11

APPEARANCES:
12

13   For the Plaintiff:      HON. JOHN R. LAUSCH, JR.
                             United States Attorney
14                           BY:  MR. ANDREW J. DIXON
                             219 S. Dearborn St., Suite 500
15                           Chicago, Illinois  60604

16

17

     For the Defendant:      LAW OFFICES OF EUGENE STEINGOLD
18                           BY:  MR. EUGENE STEINGOLD
                             111 West Washington Street, Suite 1051
19                           Chicago, IL  60602
                             (312) 726-1060
20

21

22

23   Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
25                           (312) 435-5639

1    (The following proceedings were had in open court:)

2              THE CLERK:  17 CR 789, USA v. Ronald Feder.

3              MR. DIXON:  Andrew Dixon on behalf of the United

4    States.

5              MR. STEINGOLD:  Judge, my name is Gene Steingold, and

6    I was appointed to represent Mr. Feder, who is present.

7              THE COURT:  And Mr. Feder is here.

8              MS. CLIFTON:  Good afternoon, your Honor.  Meredith

9    Clifton on behalf of probation.

10             THE COURT:  You can have a seat if you'd like,

11   Ms. Clifton.

12             So are both sides ready to go ahead with the

13   sentencing in the case?

14             MR. DIXON:  The government is, your Honor.

15             MR. STEINGOLD:  Your Honor, I'm ready, but Mr. Feder

16   apparently does not want me, so -- that's what he --

17             THE COURT:  Yeah, but that motion was made before,

18   and I ruled on it.

19             So something you want to tell me, Mr. Feder?

20             THE DEFENDANT:  Not at this time, not regarding

21   the --

22             THE COURT:  So you're -- nothing to tell me regarding

23   your attorney; am I right?

24             THE DEFENDANT:  Right.

25             THE COURT:  Okay.  Well, there you go.

1          MR. STEINGOLD:  Okay.

2          THE COURT:  Okay.  So does the government have any

3    objections or corrections to anything in the presentence

4    report?

5          MR. DIXON:  No, your Honor.

6          THE COURT:  And give me just a second here just to

7    pull up my copies of everything here.  Pardon me one second.

8          MR. DIXON:  Your Honor, one small item.

9          THE COURT:  Yes.

10         MR. DIXON:  I believe the presentence report lists

11   the agreed restitution amount as $66,000.  There was one --

12         THE COURT:  69, right?  Not --

13         MR. DIXON:  It's 69, correct.

14         THE COURT:  The math, it said 23, and it was --

15         MR. DIXON:  There was one additional request that was

16   made after the PSR was generated.

17         THE COURT:  Okay.  Mr. Steingold, did you read the

18   presentence report and discuss it with Mr. Feder?

19         MR. STEINGOLD:  Yes, I did, your Honor, and I also

20   reviewed the condition -- well, I have not seen it since prior

21   to -- prior to the -- yes.

22         THE COURT:  The last hearing.

23         MR. STEINGOLD:  The proposed supervised release --

24         THE COURT:  Let's get this out in a coherent way.

25         You looked at the proposed conditions of supervised

1    release which I had filed before the last hearing.

2            MR. STEINGOLD:  Correct.  And I reviewed it with him,

3    and I made objections, and your Honor responded to those also.

4            THE COURT:  You've just jogged my memory on something

5    that I had actually forgotten, so let me go to Mr. Feder next.

6            Did you read the presentence report, Mr. Feder?

7            THE DEFENDANT:  I did.

8            THE COURT:  And did you discuss it with your lawyer?

9            THE DEFENDANT:  I did.

10           THE COURT:  Okay.  So as I understand the plea

11   agreement, it's an 11(c)(1)(C), it's an agreed-upon sentence,

12   but you got to make the motion -- the 5(k) motion first.  And

13   then --

14           MR. DIXON:  Correct.

15           THE COURT:  So I think what makes the most sense is

16   for you to do that and then tell me everything that you want

17   to tell me about sentencing except the supervised release

18   stuff, which we'll come back to later.

19           MR. DIXON:  Yes, your Honor.  I do -- and what I want

20   to tell you, do you want to cover at least the term of the

21   supervised release?  Because I think that might be the only

22   issue.

23           THE COURT:  Yeah, that makes sense, yeah.

24           MR. DIXON:  The government is moving, under 5(k), for

25   a below-guideline sentence and a downward departure.  The

1    parties have agreed, pursuant to 11(c)(1)(C), the defendant be

2    sentenced to a term of imprisonment to include 300 months.

3         The government is further requesting that defendant

4    be sentenced to lifetime supervised release thereafter subject

5    to the conditions recommended by pretrial services.

6         As an initial matter, I'd like to address the

7    elements here in mitigation.  Most significantly, and as

8    detailed in the government's version of the offense, defendant

9    provided substantial assistance to the government which

10   allowed it to pursue charges against multiple other

11   individuals, some of whom the government might not have been

12   able to charge otherwise.

13        With respect to the person identified in the

14   government's version as individual A and who I can now

15   identify as a man named Simon Davis, the defendant provided

16   information to law enforcement that led to the identification

17   of Davis as an individual who had met with defendant to

18   exchange child pornography in the past.  The defendant allowed

19   law enforcement to impersonate defendant online in

20   communications with Davis and communicated with Davis himself

21   over the phone to assist law enforcement in arranging a

22   meeting --

23        THE COURT:  This is after Davis had kind of balked a

24   little bit.

25        MR. DIXON:  Exactly.  Davis had indicated that he was

1  reticent to me because he suspected that the undercover was an
2  undercover. The defendant spoke with Davis to convince him to
3  come to the meeting and to bring child pornography to trade.

4        Davis was arrested at that meeting with a substantial
5  amount of child pornography, and it's unlikely that law
6  enforcement would have been able to arrange that meeting
7  without the defendant's assistance because of his reticence
8  and suspicion of the undercover.

9        This past May, Davis pled guilty to possession of
10 child pornography in the Southern District of Ohio, and he is
11 currently awaiting sentencing.

12       Defendant also provided assistance against an
13 individual named Paul Scarberry (phonetic), with whom law
14 enforcement suspected defendant had previously traded child
15 pornography. Defendant allowed law enforcement to impersonate
16 defendant online and to communicate with Scarberry as the
17 defendant. This led to Scarberry sending thousands of files
18 of child pornography to an agent posing as the defendant.
19 Scarberry pled guilty last year to possession and distribution
20 of child pornography in Oklahoma and was sentenced to 10
21 years' imprisonment with five years suspended.

22       Next, defendant provided law enforcement with
23 assistance against an individual named Jessie Medina
24 (phonetic). In particular, defendant provided law enforcement
25 with consent to search an email account, which allowed law

1    enforcement to identify Medina, who is a K-through-8 school

2    board president in Michigan, as an individual with whom

3    defendant had previously exchanged child pornography and who

4    had told the defendant that he was molesting a friend's

5    daughter and discussed with the defendant his fantasies of

6    kidnapping and raping a child.  The defendant's assistance

7    allowed us to find him more quickly than we would have been

8    able to otherwise because we didn't have to seek a search

9    warrant.  We had consent to search the account.

10           Medina was sentenced earlier this year to 78 months'

11   imprisonment in the Eastern District of Michigan for receipt

12   of child pornography and accessing with intent to view child

13   pornography.

14           Lastly, defendant provided assistance to help law

15   enforcement identify an individual named Christopher Colone

16   (phonetic) as another individual with whom defendant had

17   previously met to exchange child pornography.  Mr. Colone was

18   charged in this district with two counts of receipt of child

19   pornography and one count of accessing with intent to view

20   child pornography, and that case remains pending.

21           The defendant has already provided grand jury

22   testimony relating to Mr. Colone, and he may be called to

23   testify at trial if that case proceeds.

24           Because of defendant's cooperation, the government is

25   moving for a downward departure from the guideline range,

1   which is 360 months to life, and has agreed with defendant to
2   a sentence of 25 years' imprisonment.

3          Also in mitigation, defendant reported to having
4   suffered a difficult childhood and an abusive father.
5   However, as noted in the PSR, defendant also admitted to
6   molesting his then nine-year-old brother when the defendant
7   was 17, which suggests that despite his difficult upbringing,
8   defendant was responsible for making his younger brother's
9   upbringing even worse.

10         Other than that, your Honor, there is little in
11  mitigation in this case.  The defendant is a predator.  He was
12  attempting to find a child to molest while on pretrial
13  supervision in this district for possession of child
14  pornography.  He was not a passive viewer of child
15  pornography; he was an enthusiast.  He was not just sharing
16  his massive collection of child pornography with others; he
17  was coaching others on how to find child pornography online
18  and meeting with other pedophiles in person to watch child
19  pornography and obtain children's underwear.

20         He was not just fantasizing about molesting children;
21  he was fantasizing about the children who came into the
22  grocery store where he worked and was attempting to trade
23  child pornography for access to children to molest.

24         Indeed, in what was effectively their first
25  communication, defendant asked the undercover agent if he had

1   children, suggested setting up a time where defendant could

2   meet and molest the undercover's relatives, and offered the

3   undercover 60 to 80 gigabytes of child pornography in exchange

4   for making it happen.  That's how desperate the defendant was

5   to molest a child.

6         In an initial conversation, the defendant sent the

7   undercover, who is a complete stranger to him at that point,

8   samples of child pornography from his collection and offered

9   to provide the rest in exchange for his help in finding a

10   child to molest.

11         And we know why the defendant was so desperate to

12   molest a child, because he was on pretrial release for another

13   child pornography charge in district with a change of plea set

14   just a few weeks away at the time.

15         What comes across -- and there are subsequent

16   conversations where defendant rarely missed an opportunity to

17   push the undercover to set up that meeting so the defendant

18   could molest the undercover's minor relatives.

19         The defendant also coached the undercover based on

20   his research on how best to condition minor relatives to make

21   them easier to molest.  He suggested lies that the undercover

22   could tell the children's parents to facilitate the meeting.

23   He expressed remorse to the undercover that he didn't know a

24   child himself that he could, quote, lend to the undercover to

25   molest, because that's how the defendant thinks about

1   children.  He doesn't think of them as people.  He thinks of

2   them as objects to be lent out for his own sexual

3   gratification.

4         It wasn't enough that he was perpetuating the

5   victimization of children whose videotaped rape he was

6   gleefully distributing.  He wanted to victimize a child

7   himself.

8         When they finally met, the defendant not only

9   provided the undercover with his massive collection of child

10  pornography; he further explained to the undercover how he

11  could find a guide on the dark web called The Pedophile's

12  Handbook, which included sections such as, quote, Finding

13  Children:  Babysitting and Scouting, a section called Sex With

14  Kids, Penetration Training, and a section called Escape

15  Planning.

16        In defendant's home, which was searched after his

17  arrest, law enforcement found more child pornography, latex

18  molds of prepubescent vaginas, and children's underwear.  No

19  children lived in the house.

20        What comes across in defendant's conversations with

21  the undercover is that defendant is an intelligent,

22  manipulative individual who is passionate about child

23  pornography and molesting children.  The Court should be

24  deeply skeptical of any claim the defendant has that he has

25  now found remorse because defendant no doubt planned to tell

1    Judge Shah the very same thing had he not been caught

2    committing the instant offense in this case.

3          Defendant was intelligent and manipulative enough to

4    have anything escalate his sexual predation while on

5    supervision and to do so in a manner that gave pretrial --

6    pretrial no indication of what he was up to.

7          It's also worth noting that defendant lied to

8    probation in his interview with -- with the -- for the PSR,

9    telling him that he would never abuse a child despite

10    admitting in the plea agreement to attempting to do so.  He

11    told him that he had not viewed child pornography since early

12    2017, despite talking about and sharing child pornography with

13    the undercover agent in December of 2017.

14          All of this suggests the defendant will be an

15    exceedingly difficult individual to supervise, as he's shown a

16    facility for evading supervision and a willingness to lie to

17    probation, but that doesn't mean he shouldn't be supervised.

18    If anything, it suggests that he needs to be supervised more

19    closely.

20          The defendant is a danger to children now, and he

21    will remain a danger to children when he is released in 25

22    years.  Accordingly, the government is asking the Court to

23    order lifetime supervised release upon the termination of

24    defendant's agreed-upon 25-year sentence.

25          Thank you.

1      THE COURT:  Mr. Steingold.

2      MR. STEINGOLD:  Yes.  Well, the government, I mean,

3  explained what Mr. Feder did do, but I'd like to point out

4  that the two counts that he's charged with are five years

5  to 20 imprisonment, which is 2452(a), and while the guidelines

6  are 360 to 480 months, I'm not sure if keeping him longer in

7  prison is going to cure him.  I think what he does need is

8  treatment, and we did have a psychosexual evaluation

9  conducted.

10      And, obviously, he knows he did something wrong, and

11  he did cooperate with the government.  And that cooperation

12  was very extensive.

13      He's in bad shape both physically and emotionally,

14  and he's got a documented history of depression,

15  hyperactivity, ADHD.  He's got some physical allergies, back

16  pain.  He's lactose intolerant.

17      He's got no history of substance abuse, no history of

18  violence, and there's no really criminal history on him.  I

19  mean, yes, he does have criminal history with these things,

20  but I think what would be the best for him is I know there are

21  some facilities like Springfield where they do have medical

22  care, and I think what he needs is treatment more than

23  anything else.  He's not a violent person.  And he has been

24  taking whatever courses were available here.

25      And so, I mean, that's all I could add.  He does know

1   that there is a problem, but I think that putting him away

2   for -- he's, I think, 30-some years old.  For him to come out

3   as an old person where it's really -- he will not be able to

4   establish himself in society.  He -- you know, he's still

5   capable of working, and he could be a productive member.

6          He knows he will have to -- he's going to be

7   supervised, he's going to be registered, and -- but still,

8   what he needs is treatment, not more prison.  Prison isn't

9   going to give him any treatment.  He might get in more trouble

10  being in prison, as he already got -- when he -- whatever

11  happened there, obviously, he filed a motion to get rid of me,

12  so somebody must have told him that.

13         But anyway, so I don't think prison is the answer for

14  him.  I think that he does need supervision and he needs

15  medical care.

16         And also, there's -- I know Mr. Feder likes to read

17  at night, there's like thousands of pages of reports, and when

18  I went through them, a lot of their -- they're boilerplate

19  requests, and some of them prepared in 2014.  I mean, I don't

20  know --

21         THE COURT:  Yeah, it's essentially a -- honestly,

22  I've always kind of viewed it as a package that essentially

23  gets submitted, sometimes with some additions, sometimes with

24  some subtractions, and --

25         MR. STEINGOLD:  I mean, there's people from Utah,

 1   people from --

 2              THE COURT:  No, that's true.  In any child

 3   pornography case where there is some indication that the

 4   material involved a particular victim in the case -- in other

 5   words -- I assume there's like a chart somewhere that people

 6   kind of work off of, and then you can provide this request and

 7   that request.  And the idea, I assume -- and I recognize that

 8   some of these are -- the idea, I assume, is that not many

 9   people have to rewrite these every time a case comes up,

10   because there's lots of cases.

11              MR. STEINGOLD:  Yeah.  And also, since -- this is

12   just a criminal case, I guess -- I don't know if he's going to

13   ever make any money, but they'll probably be looking to sue

14   him civilly.

15              THE COURT:  I don't know whether that happens or not,

16   honestly.  Okay.

17              Is there anything that he said that you want to

18   respond to?

19              MR. DIXON:  Your Honor, we don't disagree.  I mean,

20   we believe he should be sentenced to the agreed-upon term of

21   25 years' imprisonment.  We don't necessarily agree that he

22   needs treatment.  We think he needs a lifetime of treatment to

23   keep him from being a danger to the community, and in that

24   form, ask for lifetime supervision.

25              THE COURT:  I have three questions.  The first one is

1   what's going to happen with the case in front of Judge Shah.
2   I know this is probably in the plea agreement, but I am
3   blanking on it.

4           MR. DIXON:  Your Honor, it's going to be dismissed
5   following this sentencing.

6           THE COURT:  Okay.  Got it.  That was the first
7   question.

8           The second question is this.  As I understand it, and
9   I think part of this relates to the -- more directly to the
10  case in front of Judge Shah than this case.  As I understand
11  it, so Mr. Feder was a civilian employee of DoD, and the
12  conduct that he was charged with in the case in front of Judge
13  Shah, which is a 2016 case, the conduct occurred, and as best
14  I can figure out from the presentence report, was discovered,
15  in or about the middle of 2014.  So June of 2014.  And he
16  wasn't charged until September of 2016.  Is there any kind of
17  an explanation for what the heck happened there?

18          MR. DIXON:  Your Honor, I don't know the answer.  I
19  wasn't involved in that case.

20          THE COURT:  Yeah.  I mean, was the U.S. Attorney's
21  Office even aware -- I mean, I guess one of my questions is
22  presumably somebody at DoD discovered it because the
23  indication was it was discovered because he was using the VPN
24  or whatever it was.  Did it get reported to DoJ or --

25          MR. DIXON:  Yeah, I don't know the particulars of the

1    investigation that underlied that case.

2            THE COURT:  Do you know from what you've read,

3    Mr. Steingold?

4            MR. STEINGOLD:  No, your Honor.  I know that he was a

5    Merchant Marine.

6            Were you honorably discharged?

7            THE DEFENDANT:  No, I quit.

8            THE COURT:  He resigned, but he wasn't even removed

9    from the service in the intervening two years.  Mr. Feder then

10   resigned from the service, and then shortly after that, he was

11   charged.

12           Seriously, you can't --

13           MR. DIXON:  I don't know the reason for the delay.

14           MR. STEINGOLD:  It was an assistant.  Was it Maguire

15   (phonetic) or somebody who was from a different district?

16           MR. DIXON:  She works in our district.

17           THE COURT:  Yeah.  Well -- okay.

18           And then my other question is -- and there's a --

19   it's not clear to me that it's a disputed issue that I have to

20   determine, but there's an issue raised about this arrest,

21   maybe arrest.  It's not even clear to -- it looks like there

22   was an arrest because there is an arrest report that's

23   referenced here that happened in 2015?

24           2005.  Excuse me.  2005.

25           MR. STEINGOLD:  That's Chicago police because I think

1    I was trying to find it, and there was -- really, there was no

2    record.

3                THE COURT:  So the probation officer refers to an

4    arrest report.  Did you actually see an arrest report?

5                MS. CLIFTON:  Yes, your Honor.

6                THE COURT:  Okay.  But nobody knows what happened

7    with the case?

8                MR. DIXON:  I don't know the disposition of that

9    case, no.

10               MR. STEINGOLD:  I think, if I remember from the

11   report, there was nothing there.  And also, there's nothing on

12   his, quote, unquote, rap sheet --

13               THE COURT:  Yeah, but, I mean, as one of my retired

14   former colleagues used to say, I didn't just fall off the back

15   of a turnip truck, okay?

16               So there is an arrest report.  That means somebody

17   got arrested.  There's records somewhere that show what

18   happened to the person, whether they were released because the

19   charges were -- no charges were filed, when the charges were

20   filed, they were taken to court and dismissed, and the answer

21   is -- even on the government's side, the answer is you don't

22   know.

23               MR. DIXON:  Your Honor, I don't know -- I don't know

24   the particulars of what happened with the case in 2005.

25   Defendant was a minor at the time.  I would not be surprised

1    if that's --

2            THE COURT:  But that was, no, according to -- if the

3    presentence report has it right, he was 18.  So that's not a

4    minor.  So let me just double-check that and see if that's

5    right.

6            Date of birth, I'm checking, yep, he was one week

7    older than 18.  So not a minor.

8            MS. CLIFTON:  Your Honor, I believe at the time the

9    offense was committed, according to the arrest report, he

10   was 17.

11           The arrest occurred --

12           THE COURT:  Do you have the arrest report?

13           MS. CLIFTON:  I can pull it up.

14           THE COURT:  Can I look at it?  I can look at it on

15   your laptop.  That would be just fine.

16           I mean, I completely get that there's an agreed-upon

17   sentence here, but, you know, these are -- I mean, these

18   questions kind of jump off the page, quite honestly.  And, you

19   know, both of these potentially involve earlier opportunities

20   where the criminal justice system could have intervened and

21   done something and apparently did not.  And I am --

22           MR. STEINGOLD:  Your Honor, also, some of the family

23   members are here.

24           THE COURT:  -- I would be remiss if I didn't want to

25   know something about why that happened or didn't happen or

1   whatever you want to say about it.

2          I am just going to wait for Ms. Clifton to pull up

3   the report, and I am going to look at it.  Thanks.

4          I am just going to say this over here so I can give

5   Ms. Clifton's laptop back.  So the arrest report which I am

6   looking at here, it's an old-style, typewritten version, but

7   there is a handwritten notation.  So there is a listing of the

8   charge, 720 Illinois Compiled Statutes 5/12-14.(a)(1)(A),

9   which is predatory CSA, criminal sexual assault.  Right below

10  that, it's written in handwriting RWOC, which Ms. Clifton

11  says, and is consistent with my memory, is released without

12  charge.

13         So we don't know why, and we will probably never be

14  able to find out why.  That cures that, solves that problem

15  for me.

16             MR. STEINGOLD:  May I, just one last thing?

17             THE COURT:  Yeah.

18             MR. STEINGOLD:  His family is here.  There's a bunch

19  of them here.  So they -- if your Honor wants to ask them

20  anything --

21             THE COURT:  I don't want to intrude into family

22  members' memories and things like that.

23         Okay.  Mr. Feder, so you have the right to tell me

24  anything that you would like to before I impose a sentence on

25  you, and this is your chance to do that.

1          THE DEFENDANT:   Thank you, your Honor.

2          As stated, my mom, my sister, my biological uncle,

3  and a family friend are all here.  More wanted to show up, but

4  medical and work life issues prevent that.

5          I have statements from people who weren't able to

6  attend, family friends who have known me for years, and I have

7  a large support network behind me.

8          Now -- so all of this is going to help facilitate

9  rehabilitation.  Now that the family knows the extent of my

10  activities, they have the ability to prevent me and keep an

11  eye on me, and, along with probation, will allow for a closely

12  monitored situation where I won't be able to do anything

13  further, nor do I want to at this point.  The -- having been

14  able to finally read statements from actual victims and --

15  that was provided with the PSR, it drastically changed my

16  perceptions of the nature of the crime and how much of a

17  continued impact it further caused for these victims.

18          And for the majority of them, I realize that they

19  want this to go away, and, hopefully now with the advent of

20  artificial intelligence, we might actually be able to get

21  that.  And I have no -- I have all the wishes I could possibly

22  do, and if there's anything I could do to try to help

23  facilitate the complete destruction of all this stuff that is

24  detrimental to not just the victims but their family, their

25  friends, everyone involved, it's -- having been able to

1  actually read all that and being here and talking to even just

2  the prosecutors and talking to the defense attorneys, talking

3  to probation, other people in the facility, therapists, it's

4  opened my eyes.  I had no idea the extent of it.

5        And as stipulated before, the conduct with my brother

6  back when I was 17, seeing the harm firsthand that it caused

7  everything, it's -- there's -- it's something I never would

8  have allowed myself to continue through.  And if you look

9  through the transcripts of the conversations I had with the

10  undercover, it was -- he said -- he offered opportunities to

11  show up at a hotel.  I denied every single one of them.  It

12  was purely supposed to stay in a fantasy realm.  I was never

13  intent on ever allowing that to actually come forth.

14        And strictly because I have seen what it does to

15  people.  And now having further been able to see the rest of

16  it, the rest of the harm, even just the material causes,

17  it's -- I could definitely see that.  And there's -- this

18  therapy that I'm finally able to partake in, it's long

19  overdue.  I wish I was able to have went through this years

20  ago, not just stress and anxiety and social, emotional

21  problems I have had since childhood growing up, going through

22  what I feel was -- I consider myself I've never really gone

23  through a typical adolescence.  And moving forward, it's a

24  very hard adjustment trying to jump into the adult world.  But

25  just in general, this is the therapy that I should have had

1    eons ago.

2         I'm very grateful that I am now not in a position

3    to -- I'm in a position to actually get that therapy that I

4    needed.  And it's -- I mean, it's going to take more than 120

5    percent of my effort, and I have absolutely no intention to

6    try to avoid that or circumvent that in any way.  There is --

7    I -- having, again, seen everything, it's -- this whole thing

8    is just a huge scourge on the society and it needs to change.

9         To that effect, there's -- it's difficult to

10   pinpoint.  There seems to be a huge disparity with sentencing

11   when it comes to what people get versus what their crimes are.

12   One of the letters I was reading stated a victim was afraid

13   that her father was going to get out in five years, and as

14   such -- he destroyed her life.  And for them -- for her to be

15   afraid in five years didn't make much sense.  So I've seen a

16   lot of -- it seems to be a trend moving further down.

17        Again, I need therapy.  I need intense work with

18   trained psychiatrists in a secure environment so I can

19   actually focus on nothing but getting the help I need so I

20   don't do this again.  And I plan to put whatever I can into it

21   to prevent that from ever happening again.

22        To that effect, contact with friends, family, and the

23   community will help facilitate that.  In the last 18 months

24   now, I've been at MCC.  I have been working with the chaplain.

25   I have been doing numerous correspondence courses on getting

1  back in touch with my Jewish upbringing, my heritage, the

2  religion, the morals, ethics, the values associated with that,

3  and delving back into that wholeheartedly, because if -- with

4  that support structure and that guidance from the religious

5  point of view, knowing that what I do on my own in my own room

6  that is still being observed, it's still affecting others, and

7  it's affecting me.  And it's been a trend, and it's an -- I

8  feel very strongly, from my understanding of what an addiction

9  is, it feels like that's what addictions are described as.

10  And I just wish there was some way to just reset whatever part

11  of my brain needs to be reset and prevent that from happening

12  again.

13          Now, if it's at all possible, I know it's only a

14  recommendation, but, your Honor, the facilities at Fort Dix or

15  Otisville are close to -- are near by my sister who lives in

16  New York, along with our family rabbi, who lives out there,

17  who would be able to visit and help -- and just the Jewish

18  community, which, fortunately, there's a lot of Jewish people

19  at those facilities, but having large study groups and groups

20  of people, and --

21          THE COURT:  I have no problem making that

22  recommendation.

23          THE DEFENDANT:  Thank you.  Thank you, your Honor.

24          Along with intense therapy, a connection to family

25  and community, I feel can do nothing but help in this case.

1      THE COURT:  I neglected to -- I put off one thing and
2   then didn't come back to it.  Does the government have any
3   issues or problems with any of the proposed supervised release
4   conditions that I proposed?
5      MR. DIXON:  No, your Honor.
6      THE COURT:  And you went over those, you said, with
7   Mr. Feder.
8      MR. STEINGOLD:  Yes, I did.
9      THE COURT:  Did you have any objections or
10  corrections on anything?
11     MR. STEINGOLD:  I believe that your Honor did respond
12  to them.  I don't recall offhand now, but I think we did
13  submit our objections, and your Honor made the changes.
14     THE COURT:  I dealt with them?  Okay.  So I got to
15  figure that out now.  So give me a second here.
16     So you had -- this would be in the sentencing
17  memorandum, I'm assuming.  It's been so long since we did
18  that, honestly, I don't specifically recall.
19     Yeah, I think I've dealt with those.
20     Okay.  So first of all, on the supervised release
21  conditions, the law requires me to actually go through and
22  read each one of them out loud, unless you tell me I don't
23  have to.
24     Do I have to?
25     THE DEFENDANT:  No, I have read it.

1       THE COURT: All right. So the crimes in this case

2  were extremely severe. There are a lot of victims. Even to

3  the specific charges that Mr. Feder pled guilty to, they may

4  not be victims right there, but they are victims nonetheless.

5  A number of them have submitted materials that were provided

6  along with the presentence report. And the effect on them is

7  serious, and it doesn't go away. And they all, of course,

8  know, and Mr. Feder acknowledged this, that the material in

9  question is still out there, and other people are looking at

10  it. So it's kind of a continuing harm to those unfortunate

11  people who were, you know, forced into this kind of activity.

12  And they had no idea what they could do about it.

13       So since there are family members here -- and I know

14  Mr. Feder understands this because we went over it at his

15  guilty plea hearing, but I want to make sure the family

16  members understand this -- so in federal court, we have these

17  things called the federal sentencing guidelines. And for any

18  type of a crime, you have to calculate two different

19  calculations. One has to do with the person's criminal

20  history, if they have one, and the other has to do with the

21  circumstances of the crime. And there's all sorts of details

22  you have to go through on that. And you come out with a

23  combined calculation that basically gives you what under the

24  law is called an advisory range under the sentencing

25  guidelines which a judge has to take into account.

1    And so in Mr. Feder's case, that was as high as it
2  could -- well, I guess there's some where it's pure life, it's
3  just life.  But other than that, this is as high as it could
4  get.  So the calculation under the sentencing guidelines, so
5  if Mr. Feder had gone to trial just on the two charges -- or
6  just on the charges that he's pleading guilty to, not even on
7  the other ones, and had lost at trial, he would have been
8  looking at a sentence of at least 30 years and possibly a life
9  sentence.  And Mr. Feder is 32 years old, and a life sentence
10 is obviously a very long time for anybody, certainly for
11 somebody who is 32.

12    So the agreement that was made that Mr. Feder entered
13 into a plea agreement with the government, it's a particular
14 type of plea agreement that says that he's pleading guilty to
15 these charges.  He has -- as the prosecutor has pointed out,
16 has cooperated fairly extensively with the government in
17 catching and prosecuting other people.  And so because of
18 that, the government was willing to make a -- was willing to
19 propose a lower sentence than 30 years.  And the agreement
20 that was made by the government and Mr. Feder is they agreed
21 on the sentence for me to impose.

22    And the agreement, both the government and Mr. Feder,
23 was a 25-year prison sentence; 25 years in prison.

24    So when we get to this stage of sentencing, as the
25 judge, I basically have to decide do I accept that or not.  If

1   I accept it, then I impose that sentence, and that's the
2   sentence.  I don't have the authority to modify it because it
3   was agreed to by everybody and there is a rule that says
4   that's the way it works.

5        If I don't accept it, that doesn't mean I can impose
6   a lower sentence.  That means that we go back to square one;
7   Mr. Feder has the option to go to trial, if he wants to, and
8   could then potentially be facing an even higher sentence, 30
9   years, 35 years, 40 years, life -- life without parole, et
10  cetera.

11       So the decision that I am making is whether, you
12  know, the factors that a judge considers when sentencing
13  somebody support and make a 25-year prison sentence
14  appropriate, and I think they do.  The crimes are extremely
15  serious.  I mean, I will note in particular that Mr. Feder was
16  already under indictment for a very serious charge of this
17  nature when he was then arrested committing the crimes on
18  which he's now pled guilty to, which weren't just crimes, they
19  were also a violation of the conditions that the judge had --
20  in the other case had imposed previously.  So it was pretty
21  aggravated conduct, which suggested that -- would suggest to
22  any reasonable person, quite honestly, that at least at that
23  point in time, Mr. Feder was a pretty serious danger to the
24  community and to other people, and that's why he was arrested
25  and held in custody and has remained in custody since then.

1   That and the other evidence that's discussed in the

2   presentence report I think all suggest to me that a 25-year

3   sentence is an appropriate sentence for the crimes that

4   Mr. Feder has pled guilty to in light of his background.

5   Now, I -- I mean, I don't disregard what Mr. Feder

6   said earlier about, you know, his realization of the harm that

7   this type of crime caused to his victims -- or to his victims

8   and the victims of child pornography generally.  I don't

9   disregard that at all.  But that's a factor that I take into

10  account not in deciding would I impose a different sentence,

11  but rather in deciding whether I accept the sentence that

12  Mr. Feder and the government agreed to.  And I think in light

13  of all those factors, it's an appropriate sentence.

14  And so I'm going to impose the agreed-upon sentence

15  of 25 years.

16  I will say a couple of things.  I mean, I -- it's

17  really unfortunate -- and I guess I get what happened with the

18  case where Mr. Feder was arrested by the Chicago police.  I

19  won't know the details of it, but the fact that he was RWOC,

20  released without charge, suggests that either there wasn't a

21  desire to prosecute him or they didn't think the evidence was

22  sufficient to support it.

23  That to the side, I do think it's quite unfortunate,

24  and I don't know why it happened this way, that Mr. Feder was

25  apparently apprehended or caught in the act, so to speak, of,

1   you know, viewing and possessing child pornography by somebody

2   at the Department of Defense in 2014 and, essentially, it

3   seems, from what I can tell, that nothing was done about it.

4   He wasn't separated from the service.  It doesn't appear to

5   have been a referral for prosecution; at least there was no

6   prosecution.

7           I will say that -- and I appreciate that maybe you

8   weren't the first person on this case and don't know the

9   answer, but if anything happens here, somebody at some point

10  ought to be going back and trying to figure out what happened

11  there and telling the people, whoever they were, that either

12  made the decision not to charge Mr. Feder then, refer him for

13  prosecution, and, arguably, from best I can tell, just sat on

14  their hands, that something was badly wrong, and there needs

15  to be some examination of why that happened -- or why it

16  didn't happen, I guess, that he was referred for prosecution.

17  Maybe all of this would have turned out way differently if

18  that had happened.  There is no way of knowing.

19          That, however, is not really something I take into

20  account.  It's just a factor that's out there.

21          So the sentence -- given my agreement and my

22  acceptance of the plea agreement and the agreed-upon sentence,

23  the sentence that I'm imposing on Mr. Feder, and this is on

24  counts -- so I have to do -- make sure I'm getting this

25  right -- I have to do some of it on one count and some of it

1    on another count, right?  Because these are both 20-year

2    maximum counts?

3              MR. DIXON:  Yes.  Correct, your Honor.

4              THE COURT:  Right?  Okay.

5              So should I -- was there an agreement on what it

6    would be on each count, or is it just an agreement on the

7    overall?

8              MR. DIXON:  It was just an agreement on the overall.

9              THE COURT:  So what I am going to do is I am going to

10   impose a 20-year sentence on each count.  I think I can do

11   this, right?  I can do 20 years on each count, but five of the

12   years on Count 4 are consecutive to the sentence on Count 1,

13   and the other 15 are concurrent.  Can I do that?  Sounds

14   right, right?

15             MR. DIXON:  I believe so.

16             THE COURT:  I think so.  Okay.

17             So the sentence on Count 1 is 20 years.

18             The sentence on Count 4 is 20 years.

19             The sentence on Count 4, 15 years of it is to run

20   concurrently with Count 1.  Five years is to run consecutively

21   with Count 1.

22             That means the total sentence is 25 years.

23             I am not imposing a fine because of the restitution

24   obligation.

25             The restitution is $69,000.  I am just going to ask

1   you to get whatever lists or payee information to my courtroom
2   deputy clerk, and she will get it entered.

3          Special assessment of $200 is mandatory.

4          I guess the JVTA assessment is not being recommended
5   by probation, given the restitution issue, which makes sense
6   to me.

7          I am also waiving the cost of imprisonment and
8   supervision.

9          I do believe that -- and Mr. Feder is going to be, if
10  everything works out the way the math works, is going to be
11  probably in his mid to late 50s when he gets out of prison.

12         I am going to impose a term of 25 years of supervised
13  release with all the conditions that had previously been
14  listed.  And that's on both counts but concurrent.  So the
15  total is 25 years.

16         And there is a motion to dismiss the other counts, I
17  assume?

18         MR. DIXON:  Yes, your Honor.

19         THE COURT:  The other counts are dismissed on the
20  government's motion.

21         I am going to recommend that Mr. Feder be designated
22  to either FCI Otisville, O-t-i-s-v-i-l-l-e, or FCI Fort Dix
23  because his family connections are in that area and that's an
24  important aspect of rehabilitation, and also that Mr. Feder
25  receive sex offender counseling and treatment while in

1    custody.

2         So before I advise Mr. -- there was a -- there's no

3    appeal if I impose the agreed-upon sentence, so I am not going

4    to advise Mr. Feder of his appellate rights.

5         Is there anything anybody thinks I've missed --

6         MR. STEINGOLD:  Unless I'm incompetent, then he could

7    appeal that.

8         THE COURT:  Pardon?

9         MR. STEINGOLD:  I said if I'm incompetent, he can

10   appeal.

11        THE COURT:  Okay.  Anything else that anybody thinks

12   I've overlooked?

13        MR. DIXON:  Not from the government.

14        THE COURT:  Mr. Steingold?

15        MR. STEINGOLD:  No, your Honor.

16        THE COURT:  Okay.  So, Mr. Feder, normally you'd have

17   the right to appeal.  You gave that up, with some very limited

18   exceptions, in the plea agreement.  I'd just refer you to the

19   plea agreement for that.

20        It's a lot of time, but you know what?  I'm 62.

21   You're going to be younger than me when you get out.  I kind

22   of still think of myself as a younger person.  So you are

23   going to have life ahead of you when you get out.  And I

24   really -- I don't know whether what you were telling me before

25   is a straight story or not.  I hope it is, because if it

1   isn't, you are going to find yourself back here again.  So I

2   hope it works out.

3           Good luck.

4           THE DEFENDANT:  Thanks.  I totally understand.

5           THE COURT:  All right.  Thanks.

6           MR. STEINGOLD:  One more comment.  Had the Department

7   of Defense caught him then, he would be in treatment by now.

8           THE COURT:  Well, like I said -- okay.

9           MR. DIXON:  Thank you, Judge.

10          MR. STEINGOLD:  Thank you, your Honor.

11    (Which were all the proceedings had in the above-entitled

12   cause on the day and date aforesaid.)

13     I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter.
14

15   Carolyn R. Cox                          Date
     Official Court Reporter
16   Northern District of Illinois
     /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR
17

18

19

20

21

22

23

24

25